**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SHEAFFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-03899 |
| | ) | |
| GLENDALE NISSAN, INC. | ) | Honorable Sara L. Ellis |
| | ) | |
| Defendant. | ) | |

**JOINT MOTION FOR RULING ON DISPUTED STATEMENTS OF MATERIAL FACT
FOR DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Glendale Nissan, Inc. ("Defendant") and Plaintiff Robert Sheaffer ("Plaintiff"), by and through their undersigned attorneys, pursuant to the Court's standing order on summary judgment practice, hereby move for a ruling on five disputed statements of material fact set forth in the Parties' Joint Statement of Undisputed Material Facts. In support of this motion, the Parties state as follows:

1. Defendant intends to file a motion for partial summary judgment as to Plaintiff's Title VII Hostile Work Environment claim, in which he alleges same-sex sexual harassment.[1]

2. In compliance with the Court's standing order on summary judgment practice, counsel for Defendant provided counsel for Plaintiff with a proposed Joint Statement of Undisputed Material Facts. (*See* Exhibit A, Defendant's draft Joint Statement of Undisputed Material Facts.)

---

[1] As Defendant's Motion for Summary Judgement is currently due on February 19, 2021 (*see* Dkt. No. 61), Defendant is contemporaneously filing a motion for extension of time to file its Motion for Summary Judgment.

1

3. Counsel for Plaintiff objected to inclusion of five of the statements of material fact. The parties have conferred on these five statements and have not been able to reach a resolution. (*See* <u>Exhibit B</u>, Email correspondence between counsel for Defendant and Plaintiff.)

4. As set forth in more detail below, the disputed statements of material facts are paragraphs 22, 23, 25, 26, and 27.

***Paragraph 22:***

22. Further, Plaintiff testified that he does not believe Zubek or Binner had a general hostility toward men in the work place. Specifically, Plaintiff testified as follows:

**Q.** Do you think that Mr. Zubek's alleged harassment of you was motivated by a general hostility toward men in the workplace?
**A.** I don't know what his - - I don't believe he had a general hostility towards men at the workplace.
**Q.** Do you think that Mr. Binner's alleged harassment of you was motivated by a general hostility towards men in the workplace?
**A.** I don't believe that either, no.

([Plaintiff's Deposition Transcript], 150:3-12.)

5. **<u>Defendant's position</u>**: the above fact is directly relevant to the issue of whether the harassment alleged by Plaintiff occurred "because of" his gender. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) ("a trier of fact might reasonably find such discrimination if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear *that the harasser is motivated by a general hostility to the presence of women in the workplace*") (emphasis supplied). Moreover, the above fact consists of a direct quote from plaintiff's own deposition testimony. (*See* <u>Exhibit C</u>, excerpts of Plaintiff's deposition transcript, pp. 150:3-12.)

6. **<u>Plaintiff's position</u>**: the following is plaintiff's basis to dispute this fact: Sheaffer dep: 149.

*Paragraph 23:*

> 23.    Finally, Plaintiff testified that Zubek and Binner's alleged conduct did not affect his ability to complete his tasks. ([Plaintiff's Deposition Transcript], 161:12-163:19.)

7.    **Defendant's position:** the above fact is relevant to the issue of whether the harassment alleged by Plaintiff was severe or pervasive. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998) (the alleged harassment must be "so severe or pervasive as to alter the conditions of the victim's employment..."); *see also Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010) (analysis of whether comments were severe and pervasive includes "whether they unreasonably interfered with an employee's performance"). Here, Plaintiff testified that, despite the alleged harassment, he was "capable of doing [his] job" and was "able to complete [his] tasks."

**Q.**    So it did not interfere with your ability to do your job at Glendale Nissan?
…
**A.**    Again, I don't think it direct -- I'm capable of doing my job. You know, I've been doing it for a long time, so I'm -- I'm capable of doing my job.
…
**Q.**    So did – and did those things interfere with your ability to do your work on those days?
**A.**    Again, all it did was upset me and, you know, I mean, it frustrated with me. I mean, it was not – I was able to complete my tasks, yes.

(<u>Exhibit C</u>, pp. 161:21-162:4; 163:14-19.)

Counsel for Defendant offered to include additional testimony relevant to this issue in the parties' Joint Statement of Undisputed Material Facts, but counsel for Plaintiff has not provided any proposed addition to the Joint Statement. (<u>Exhibit B</u>, p. 3.)

3

8.      **Plaintiff's position**: the following is plaintiff's basis to dispute this fact: Sheaffer dep: 136[2], 157, 161, 162, 178, 179, 188, 193, 203. Plaintiff further believes these comments, along with the age comments, affected Plaintiff's ability to do his job: 234-235.

***Paragraphs 25 -27:***

25.      In fact, between January and March 2018 (the period during which Plaintiff alleges he was sexually harassed), 77 of the 96 employees (80.2%) were male. ([Affidavit of Keith Narozny], ¶ __.)

26.      During the same time period, 100% of the employees in the sales and finance departments were male. (*Id.,* ¶ __.)

27.      Also during that time period, all of the employees who worked at the dealership's "sales tower" were male. (*Id.,* ¶ __.)

9.      **Defendant's position**:  the above facts are relevant to the issue of whether Glendale Nissan was a "mixed-sex" workplace.  *See Oncale,* 523 U.S. at 80-81 ("a same-sex harassment plaintiff may also…offer direct comparative evidence about how the alleged harasser treated members of both sexes in a ***mixed-sex workplace***") (emphasis supplied). The facts contained in paragraphs 25 through 27 are simply a recitation of a mathematical calculation based on the roster of employees employed during the time frame Plaintiff alleges he was subjected to sexual harassment. This roster has been produced to Plaintiff's counsel and is attached hereto as <u>Exhibit D</u>. A representative of Glendale Nissan will submit an affidavit verifying the accuracy of the roster.

10.      **Plaintiff's position**: Defendant has not provided the evidentiary basis for these statements.

---

[2] A portion of page 136 has been designated confidential by Plaintiff and thus redacted in the attached Exhibit C.

WHEREFORE, pursuant to the Court's standing order on summary judgment practice, the Parties respectfully request that the Court rule on the above disputed statements of material fact and grant such further relief as it deems just and equitable.

Dated: February 15, 2021                                   Respectfully submitted,

Plaintiff ROBERT SHEAFFER                                  Defendant GLENDALE NISSAN, INC.

By: /s/  *Eugene K. Hollander*                             By: /s/ *Elizabeth M. Pall*
Eugene K. Hollander                                        Ira M. Levin
Paul W. Ryan                                               Elizabeth M. Pall
The Law Offices of Eugene K. Hollander                     Burke, Warren, MacKay & Serritella, P.C.
230 West Monroe, Suite 1900                                330 N. Wabash Ave., Suite 2100
Chicago, Illinois 60606                                    Chicago, IL 60611
312.425.9100                                               312.840.7000
*ehollander@ekhlaw.com*                                    *ilevin@burkelaw.com*
*pryan@ekhlaw.com*                                         *epall@burkelaw.com*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SHEAFFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-03899 |
| | ) | |
| GLENDALE NISSAN, INC. | ) | Honorable Sara L. Ellis |
| | ) | |
| Defendant. | ) | |

**JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois and this Court's Standing Order, Defendant, Glendale Nissan, Inc. and Plaintiff Robert Sheaffer, respectfully submit the following statement of undisputed material facts in connection with Defendant's Motion for Summary Judgment as to Count III of Plaintiff's Complaint.

**The Parties**

1.      Glendale Nissan, Inc. ("Glendale Nissan") is an Illinois licensed motor vehicle dealer, located in Glendale Heights, Illinois, authorized to sell and service new and used motor vehicles including vehicles marketed by Nissan North America, Inc. (Complaint, Dkt. No. 1, ¶ 2.)

2.      Plaintiff Robert Sheaffer ("Plaintiff" or "Sheaffer") is a former employee of Glendale Nissan.  (*Id.*, ¶ 5.)

**Venue and Jurisdiction**

3.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (*Id.*, ¶ 3.)

4.      The alleged facts and events that form the basis of Plaintiff's claims occurred within this judicial district. (*Id.*, ¶ 4.)

1

**Plaintiff's Employment with Glendale Nissan**

5.     Plaintiff became employed as a Finance Director at Glendale Nissan in April 2016. (Complaint, ¶ 5; Exhibit A, Transcript of Deposition of Robert Sheaffer, p. 47:18-23.)

6.     As Finance Director, Plaintiff's responsibilities included supervising other employees in the Finance Department and making sure that finance deals for vehicles were "going through the process properly." (Exhibit A, 62:15-23.)

7.     Plaintiff also made recommendations with respect to the hiring and firing of employees in the Finance Department. (Exhibit A, 64:3-66:9.)

8.     During his employment, Plaintiff reported to General Manager Matt Douvikas, until Mr. Douvikas left Glendale Nissan, and Director of Operations, Keith Narozny. (Exhibit A, 63:18-64:2.)

**Plaintiff's Allegations of Sexual Harassment**

9.     Plaintiff worked with General Sales Manager Mario Zubek ("Zubek") and Sales Manager Pete Binner ("Binner") during the entire tenure of his employment, from April 2016 to March 2018. (Exhibit A, p. 85:22-23.)

10.     Plaintiff alleges that, beginning in January 2018, Zubek made comments a couple of times a week to Plaintiff that if Plaintiff did Zubek a work-related favor, Zubek would give Plaintiff a "blow job." (Exhibit A, p. 128:5-8, 129:6-15, 136:7-12.) Plaintiff alleges that these comments occurred in his office and at the "sales tower" (a desk in the showroom where the sales managers sat.) (*Id.*)

11.     Plaintiff alleges that, on a single occasion in January or February of 2018, when he was at the sales tower, Zubek showed Plaintiff a notebook in which Zubek maintained drawings of penises and referenced a show on Netflix in which a character kept a similar notebook. (Exhibit

2

A, p. 136:12-20, 142:1-16.) Plaintiff alleged that he expressed his disgust with the notebook and that Zubek laughed in response. (Exhibit A, pp. 142:22-143:7.)

12.     Plaintiff also alleges that, on one occasion in January 2018, Binner put a picture of two men having sex on the computer in his office. (Exhibit A, 130:22-131:3.)

13.     When Plaintiff confronted Binner, Binner laughed and said "it's kind of funny, come on, lighten up, can't you take a joke?" (Exhibit A, 131:20-24; 132:13-22.)

14.     Plaintiff also alleges that Binner, while in Plaintiff's office discussing a deal, made a comment that he would hold Plaintiff down in the service bay and perform anal sex on him. (Exhibit A, 136:12-19.)

15.     When Plaintiff told Binner he did not think that Binner's comment was funny or a joke, Binner laughed. (Exhibit A, 135:1-6.)

16.     Plaintiff testified that "everything was a joke at [Glendale Nissan]." (Exhibit A, 151:7-8.) Plaintiff further stated that "no one took anything seriously, no matter what it was." (Exhibit A, 151:14-16.)

17.     According to Plaintiff, Zubek and Binner, joked around with "everybody." (Exhibit A, 154:2-19.) Zubek made fun of certain "green pea" sales persons more than experienced, well-performing sales persons. (Exhibit A, 154:20-1:55

18.     Plaintiff testified that he identifies as heterosexual and that many people at Glendale Nissan had met his girlfriend, who would frequently visit the dealership. (Exhibit A, 89:13-90:5, 145:3-5.)

19.     Plaintiff further testified that both Mario Zubek and Pete Binner were married to women. (Exhibit A, 147:6-12, 147:3-5.)

20.    Plaintiff testified that he had "suspicions" that Zubek may had a romantic relationship with another male employee of the dealership because Zubek and the other employee "talked about sleepovers," "joined a paintball club," "started racing go karts," and "they went out and bought bicycles and uniforms together." (<u>Exhibit A</u>, pp. 145:16-146:5.)

21.    Plaintiff does not believe that Zubek and Binner's alleged comments to him were motivated by sexual attraction. (<u>Exhibit A</u>, 149:21-150:2.)

22.    Further, Plaintiff testified that he does not believe Zubek or Binner had a general hostility toward men in the work place. Specifically, Plaintiff testified as follows:

**Q.**    Do you think that Mr. Zubek's alleged harassment of you was motivated by a general hostility toward men in the workplace?
**A.**    I don't know what his - - I don't believe he had a general hostility towards men at the workplace.
**Q.**    Do you think that Mr. Binner's alleged harassment of you was motivated by a general hostility towards men in the workplace?
**A.**    I don't believe that either, no.

(<u>Exhibit A</u>, 150:3-12.)

23.    Finally, Plaintiff testified that Zubek and Binner's alleged conduct did not affect his ability to complete his tasks. (<u>Exhibit A</u>, 161:12-163:19.)

**<u>Gender Demographics At Glendale Nissan</u>**

24.    Plaintiff testified that, during Plaintiff's employment with Glendale Nissan, the majority of the employees were men. (<u>Exhibit A</u>, 150:13-15.)

25.    In fact, between January and March 2018 (the period during which Plaintiff alleges he was sexually harassed), 77 of the 96 employees (80.2%) were male. (<u>Exhibit B</u>, Affidavit of Keith Narozny, ¶ __.)

26.    During the same time period, 100% of the employees in the sales and finance departments were male. (*Id.,* ¶ __.)

27.     Also during that time period, all of the employees who worked at the dealership's "sales tower" were male. (*Id.,* ¶ __.)

Dated: February __, 2021                    GLENDALE NISSAN, INC.

                                            By:     _____/s/  *Elizabeth M. Pall*_____
                                                    One of Its Attorneys

Ira M. Levin (ARDC No. 6192178)
Elizabeth M. Pall (ARDC No. 6306604)
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, Suite 2100
Chicago, Illinois 60611
(312) 840-7000
(312) 840-7900 (Fax)
4835-1091-2695

5

# EXHIBIT B

## Elizabeth M. Pall

**From:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Sent:** Friday, February 12, 2021 1:12 PM
**To:** Elizabeth M. Pall
**Subject:** RE: Sheaffer v. Glendale Nissan

Liz,

In response to your recent 2 e-mails, the following is our basis to dispute the 5 facts:

Par. 22: Sheaffer dep: 149

Par. 23:   Sheaffer dep: 136, 157, 161, 162, 178, 179, 188, 193, 203.  We further believe that these comments, along with the age comments, affected my client's ability to do his job: 234-235.

Regarding Par. 25-27, you have not provided me the evidentiary basis for these statements.\

Gene

Eugene K. Hollander
**The Law Offices of Eugene K. Hollander**
230 W. Monroe
Suite 1900
Chicago, IL 60606
312-425-9100
Fax: 312-899-8003
ehollander@ekhlaw.com
Ekhlaw.com

**From:** Elizabeth M. Pall <EPall@burkelaw.com>
**Sent:** Friday, February 12, 2021 12:33 PM
**To:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Cc:** Ira M. Levin <ILevin@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Gene,

Enclosed is the draft motion seeking a ruling on the five disputed statements of fact. As noted below, this must be filed as a joint motion, with each party setting forth its position on each disputed fact.

Ideally, I would like to get this on file on Monday so that it can be noticed up prior to the due date for the motion for summary judgment. I also plan to file a contemporaneous motion for extension of time to file our motion for summary judgment, requesting to file our motion within 14 days of the court's ruling on our motion seeking a ruling on the disputed facts. Please let me know if you have any objection to the extension.

Thanks,
Liz

**Elizabeth M. Pall** | *Partner*
**P** 312-840-7099 | **F** 312-840-7900 | EPall@burkelaw.com | www.burkelaw.com
**Burke, Warren, MacKay & Serritella, P.C.** 330 N Wabash Ave, Suite 2100, Chicago IL 60611

**From:** Elizabeth M. Pall
**Sent:** Thursday, February 11, 2021 12:42 PM
**To:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Cc:** Ira M. Levin <ilevin@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Gene,

Judge Ellis' standing order (pasted below) requires that we file a <u>joint</u> statement of undisputed material facts. If we cannot agree, we have to file a motion with Judge Ellis so that she can decide whether the facts can be included. I'm trying to understand whether we can come to some agreement with respect to Paragraphs 22, 23, and 25-27. I've offered to include Sheaffer's verbatim testimony for Paragraph 22 and include additional testimony related to Paragraph 23. I've also provided you with the factual basis for Paragraphs 25-27. Is it your position that we cannot come to any agreement on any of these paragraphs? If so, I'll prepare the motion to tee these up for Judge Ellis to decide (which also has to be a joint motion.)

Thanks,
Liz

**Motions for Summary Judgment**

Motions for summary judgment and responses must comply with Local Rules 56.1(a)(1)-(2) and 56.1(b)(1)-(2), as well as the procedures outlined herein.

Parties are required to file a **joint statement of undisputed material facts** that the parties agree are not in dispute. The joint statement of undisputed material facts shall be filed separately from the memoranda of law. It shall include citations to admissible evidence supporting each undisputed fact (i.e. the line, paragraph, or page number where the supporting material may be found in the record). The supporting material must be attached to the joint statement. **The parties may not file – and the Court will not consider – separate statements of undisputed facts.** However, the non-moving party may include facts in its response to the motion for summary judgment that it contends are disputed in order to demonstrate that a genuine issue of material fact exists that warrants denying the motion for summary judgment. The non-moving party must include citations to supporting material supporting the dispute and attach the same. The moving party may respond to these facts in its reply.

The parties shall not file more than 120 statements of undisputed material facts without prior leave of the Court. In complex cases, the Court might request that the parties submit a timeline of events in addition to the joint statement of undisputed material facts.

If the parties cannot agree whether proposed statements of fact are not in dispute, they may file a joint motion prior to filing the motion for summary judgment so the Court can determine whether there is a basis for the alleged disputes. That motion should set forth the proposed statements of fact at issue, with supporting material. Each statement should be followed by a response by the other party explaining why that party contends that the statement is actually in dispute, with citation to supporting material. The supporting material should be attached as exhibits to the motion. The Court will then determine whether the proposed statements of fact may be included in the joint statement as undisputed facts. Parties should provide the Court with sufficient time to rule on factual disputes before summary judgment motions are due. Failure to stipulate to an undisputed fact without a reasonable basis for doing so may result in the statement being admitted and/or the imposition of sanctions. Perfunctory objections, such as "not material" or "irrelevant," are not reasonable bases for failing to stipulate to an undisputed fact.

If the nonmoving party wholly refuses to join in the joint statement of undisputed material facts, the moving party will nevertheless be permitted to file the motion for summary judgment, accompanied by a separate declaration of counsel explaining why a joint statement of undisputed material facts was not filed.

**Elizabeth M. Pall** | *Partner*

**P** 312-840-7099 | **F** 312-840-7900 | EPall@burkelaw.com | www.burkelaw.com
**Burke, Warren, MacKay & Serritella, P.C.** 330 N Wabash Ave, Suite 2100, Chicago IL 60611

---

**From:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Sent:** Thursday, February 11, 2021 12:29 PM
**To:** Elizabeth M. Pall <EPall@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Liz,

We have no factual basis for 25-27.  As far as the other facts, we will address them in our responsive brief.  I think that I have made my position clear.

Gene

Eugene K. Hollander
**The Law Offices of Eugene K. Hollander**
230 W. Monroe
Suite 1900
Chicago, IL 60606
312-425-9100
Fax: 312-899-8003
ehollander@ekhlaw.com
Ekhlaw.com

---

**From:** Elizabeth M. Pall <EPall@burkelaw.com>
**Sent:** Thursday, February 11, 2021 12:16 PM
**To:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Cc:** Ira M. Levin <ILevin@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Gene,

Re: paragraph 22: I'm not sure what you mean by inconsistent. I'm happy to just include the block quote from Sheaffer's testimony as paragraph 22, page 150:3-12.

Re: paragraph 23: please direct us to the portion of Sheaffer's testimony (page and line number) that you believe creates an inconsistency. Once we review that, we would consider simply adding that testimony to the joint statement of facts.

You did not provide a response with respect to paragraphs 25-27. Can we assume those can be included? If not, please provide us with your position.

Thank you,
Liz

**Elizabeth M. Pall** | *Partner*

**P** 312-840-7099 | **F** 312-840-7900 | EPall@burkelaw.com | www.burkelaw.com

**Burke, Warren, MacKay & Serritella, P.C.** 330 N Wabash Ave, Suite 2100, Chicago IL 60611

---

**From:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Sent:** Thursday, February 11, 2021 7:55 AM
**To:** Elizabeth M. Pall <EPall@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Liz,

Par. 22 is inconsistent in light of the discussion we had about the application of Oncale and Par. 23 is inconsistent with other portions of his deposition testimony.

Gene

Eugene K. Hollander
**The Law Offices of Eugene K. Hollander**
230 W. Monroe
Suite 1900
Chicago, IL 60606
312-425-9100
Fax: 312-899-8003
ehollander@ekhlaw.com
Ekhlaw.com

---

**From:** Elizabeth M. Pall <EPall@burkelaw.com>
**Sent:** Wednesday, February 10, 2021 4:08 PM
**To:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Cc:** Paul W. Ryan <pryan@ekhlaw.com>; Ira M. Levin <ILevin@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Gene,

Can you provide the basis for your disagreement with Paras 22 and 23, or suggest alternative language?

Paragraph 22 provides: "Further, Plaintiff testified that he does not believe Zubek or Binner had a general hostility toward

men in the work place. (Exhibit A, 150:3-12.)"

Mr. Sheaffer testified as follows:

```
 2    behavior.
 3        Q.   Do you think that Mr. Zubek's alleged
 4    harassment of you was motivated by a general
 5    hostility towards men in the workplace?
 6        A.   I don't know what his -- I don't
 7    believe he had a general hostility towards men
 8    at the workplace.
 9        Q.   Do you think that Mr. Binner's alleged
10    harassment of you was motivated by a general
11    hostility towards men in the workplace?
12        A.   I don't believe that either, no.
```

Paragraph 23 provides: "Finally, Plaintiff testified that Zubek and Binner's alleged conduct did not affect his ability to complete his tasks. (Exhibit A, 161:12-163:19.)"

Mr. Sheaffer testified as follows:

```
 1        Q.   So it did not interfere with your
 2    ability to do your job at Glendale Nissan?
```

```
                                        Page 162
 1            THE WITNESS:  Again, I don't think
 2    it direct -- I'm capable of doing my job.  You
 3    know, I've been doing it for a long time, so
 4    I'm -- I'm capable of doing my job.
```

```
14        Q.   So did -- and did those things
15    interfere with your ability to do your work on
16    those two days?
17        A.   Again, all it did was upset me and, you
18    know, I mean, it frustrated with me.  I mean, it
19    was not -- I was able to complete my tasks, yes.
```

With respect to Paragraphs 25-27, those are simply a mathematical calculation based on the employee roster at that time. That roster is attached. Please let me know what your objection is.

Please provide a response by Friday so that, pursuant to Judge Ellis' standing order on summary judgment, we can get a motion on file early next week if we cannot agree on the facts.

Thanks,
Liz

**Elizabeth M. Pall** | *Partner*
**P** 312-840-7099 | **F** 312-840-7900 | EPall@burkelaw.com | www.burkelaw.com
**Burke, Warren, MacKay & Serritella, P.C.** 330 N Wabash Ave, Suite 2100, Chicago IL 60611

**From:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Sent:** Tuesday, February 9, 2021 2:48 PM
**To:** Elizabeth M. Pall <EPall@burkelaw.com>
**Cc:** Paul W. Ryan <pryan@ekhlaw.com>; Ira M. Levin <ILevin@burkelaw.com>
**Subject:** RE: Sheaffer v. Glendale Nissan

Liz,

We can agree to all facts except Par. 22, 23, 25, 26, and 27.

Gene

Eugene K. Hollander
**The Law Offices of Eugene K. Hollander**
230 W. Monroe
Suite 1900
Chicago, IL 60606
312-425-9100
Fax: 312-899-8003
ehollander@ekhlaw.com
Ekhlaw.com

**From:** Elizabeth M. Pall <EPall@burkelaw.com>
**Sent:** Friday, February 5, 2021 4:40 PM
**To:** Eugene K. Hollander <ehollander@ekhlaw.com>
**Cc:** Paul W. Ryan <pryan@ekhlaw.com>; Ira M. Levin <ILevin@burkelaw.com>
**Subject:** Sheaffer v. Glendale Nissan

Gene,

Enclosed please find our draft joint statement of undisputed material facts. As you know, Judge Ellis requires that we come to an agreement on all of the material facts, or file a motion with her regarding which facts we cannot agree on. As our motion is due February 19, 2021, please provide your comments by Wednesday, if possible.

Thank you,

**Elizabeth M. Pall**
*Partner*
Burke, Warren, MacKay & Serritella, P.C.
330 N Wabash Ave, 21st Floor | Chicago, IL 60611
**P** 312-840-7099 | **F** 312-840-7900
EPall@burkelaw.com | www.burkelaw.com
Profile | vCard



*Confidentiality Note: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, contact the sender via reply email and destroy all copies of the original message.*

# EXHIBIT C

ROBERT SHEAFFER                                    March 04, 2020

Page 1

 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3    ROBERT SHEAFFER,              )
                                    )
 4          Plaintiff,              )
        vs.                         ) No. 19-cv-03899
 5                                  )
      GLENDALE NISSAN, INC.,        )
 6                                  )
            Defendant.              )
 7

 8          The discovery deposition of
      ROBERT SHEAFFER, taken in the above-entitled
 9    cause, before SUSAN HASELKAMP, Certified
      Shorthand Reporter for the State of Illinois, on
10    March 4, 2020, beginning at the hour of
      10:00 a.m. and ending at the hour of 5:13 p.m.,
11    at 330 North Wabash Avenue, 21st Floor, Chicago,
      Illinois, pursuant to notice.
12

13

14

15

16

17

18

19

20

21

22    Reported by: Susan Haselkamp, CSR

23    License No.:  084-004022

24

U.S. Legal Support, Inc.
(312) 236-8352

Page 134

1    A.   No.

2    Q.   You just don't know one way or the
3 other?

4    A.   No, I'm not aware of it.

5    Q.   Okay. When is the next time that you
6 were subject to sexual harassment at Glendale
7 Nissan?

8    A.   A day or two later Pete came to my
9 office, Pete Binner came to my office, told me
10 he wanted to hold me down in the service bay and
11 perform anal sex on me.

12    Q.   What was the context to that comment?

13    A.   I don't recall what the context of the
14 comment was, but that was the statement he made
15 to me in my office.

16    Q.   He just walked in and that's the first
17 thing he said to you?

18    A.   I believe we were talking about a deal
19 or whatever and he just made that comment.

20    Q.   And you said you were in your office at
21 the time?

22    A.   Yes, ma'am.

23    Q.   Was anyone else present?

24    A.   Not that I'm aware of.

Page 135

1    Q.   What did you say to Mr. Binner?

2    A.   That's not something I joke about and I
3 don't find it funny.

4    Q.   And what did he say?

5    A.   Ha ha and he left. He laughed as he
6 was leaving.

7    Q.   Was there anything else to that
8 conversation?

9    A.   Not that I recall.

10    Q.   When was the next time you were subject
11 to sexual harassment at Glendale Nissan?

12    A.   A couple others times when Mario made
13 the same comment with in regards to, you know,
14 if you do this for me, I'll give you a blow job.
15 And, again, I stressed that's not something
16 that's acceptable behavior.

17    Q.   So sorry, just to go back for a moment.
18 Going back to the incident you just discussed
19 with Pete Binner. When did that occur, January,
20 2018?

21    A.   January -- end of January time frame,
22 yes.

23    Q.   Did you say end of January?

24    A.   Yeah, probably close to January.

Page 136

1    Q.   Okay. In these other instances with
2 Mr. Zubek where he made the same comment about
3 asking you for something in exchange for a blow
4 job, when did those occur?

5    A.   Consistently probably -- up -- up until
6 I got fired.

7    Q.   So between early January, 2018 and
8 March, '18 -- March 13, 2018?

9    A.   Yes.

10    Q.   And when you say consistently, how
11 often was that occurring?

12    A.   It occurred a couple times a week. He
13 then -- I was up at the sales tower and he
14 decided -- he showed me a book of penises that
15 he draws. He likes drawing penises. He had an
16 entire book in his -- in his desk drawer and he
17 likes to draw them and even referenced a TV show
18 on Netflix, I don't know what the name of it is,
19 but he watches this TV show on Netflix and he --
20 and I -- I -- I expressed my disgust with that.

21 [REDACTED]

Page 146

1   karts, they both went out and bought racing cars
2   together and outfits together.  When they went
3   bicycling, they went out and bought bicycles
4   together and uniforms together.  It just seemed
5   very strange and close.
6       Q.   Did you ever have any reason to believe
7   that Mr. Zubek and Arben, I believe last name's
8   Halipaj?
9       A.   Okay.
10      Q.   Is that correct?
11      A.   I believe so.
12      Q.   Were anything more than just friends?
13      A.   I don't know what the relationship was
14  outside of work.  It just seemed a little close
15  for me.
16      Q.   Did either of them ever tell you that
17  they were in a romantic relationship?
18      A.   No.
19      Q.   Did either of them ever tell you that
20  they were homosexual?
21      A.   No.
22      Q.   Other than your observations of
23  Mr. Zubek and Mr. Halipaj at the dealership, was
24  there any other reason that you had any belief

Page 147

1   that Mr. Zubek was homosexual?
2       A.   No.
3       Q.   Do you have any reason to believe that
4   Pete Binner identifies as homosexual?
5       A.   No.
6       Q.   Do you know if Mr. Zubek was in a
7   relationship at any time --
8       A.   He's married.
9       Q.   -- while you were employed?
10      A.   He's married.
11      Q.   Is he married to a woman?
12      A.   I believe so.
13      Q.   What about Mr. Halipaj, do you know if
14  he was in a relationship at the time you were
15  employed?
16      A.   I believe he was never in a
17  relationship while I was employed there.
18      Q.   What about Mr. Binner, he was he in a
19  relationship?
20      A.   Binner -- Pete was -- he got married
21  while I was working there.  He was in a
22  relationship, he got married while I was working
23  there.
24      Q.   To a woman?

Page 148

1       A.   Yes.
2       Q.   Did you ever see Pete Binner socially
3   outside of work?
4       A.   Matt Douvikas had a graduation party
5   for his son where myself, Dave Martin, Pete
6   Binner, Arben, that may have been it.
7       Q.   When was that?
8       A.   I'm sorry?
9       Q.   When was that?
10      A.   June, July of whatever graduation is
11  for a kid in high school, grade school.  So it
12  had to be June or -- end of -- you know, June
13  of '16 I believe it was.
14      Q.   And was that a party at Mr. Douvikas'
15  house?
16      A.   Yes, ma'am.
17      Q.   Other than attending that party at
18  Mr. Douvikas' house in June of 2016, did you
19  ever interact socially with Mr. Binner outside
20  of work?
21      A.   No.
22      Q.   Did you ever make plans to meet up with
23  him at the Rib Fest?
24      A.   We may have made plans to meet up at

Page 149

1   the Rib Fest, yes.
2       Q.   When was that?
3       A.   I don't know the year, again.  I don't
4   know.
5       Q.   And did you meet up with him at the Rib
6   Fest?
7       A.   No.
8       Q.   Why not?
9       A.   I don't believe we ran into each other
10  at the Rib Fest.  I think I was there at a
11  different time and he was there at a different
12  time.  It wasn't -- it was a very loose plan, if
13  you will.  Like, hey, I'll see you there if
14  you're there.
15      Q.   Do you think that Mr. Zubek's alleged
16  harassment of you was motivated by a sexual
17  desire towards you?
18      A.   I don't know what his -- what his
19  situation was.  It just was an uncomfortable
20  situation and I did not enjoy it at all.
21      Q.   Do you think that Mr. Binner's alleged
22  harassment of you was motivated by a sexual
23  desire for you?
24      A.   Again, I don't know what Mr. Binner was

Page 150

1  thinking.  I just -- it's not acceptable
2  behavior.
3      Q.  Do you think that Mr. Zubek's alleged
4  harassment of you was motivated by a general
5  hostility towards men in the workplace?
6      A.  I don't know what his -- I don't
7  believe he had a general hostility towards men
8  at the workplace.
9      Q.  Do you think that Mr. Binner's alleged
10 harassment of you was motivated by a general
11 hostility towards men in the workplace?
12     A.  I don't believe that either, no.
13     Q.  You would agree wouldn't you that the
14 majority of the employees at Glendale Nissan
15 were men, correct?
16     A.  Yes.
17     Q.  Is that true of all the automobile
18 dealerships that you've worked at in your
19 career?
20     A.  It does seem to be the case.  It's a
21 male oriented group, yes.
22     Q.  When you were working at Glendale
23 Nissan, was there what I would describe as kind
24 of locker room banter amongst employees, maybe

Page 151

1  calling someone a name or anything like that?
2          MR. WHITE:  I object to form and
3  foundation.
4          THE WITNESS:  Yes.
5  BY MS. PALL:
6      Q.  What kind of locker banter occurred?
7      A.  Everything was a joke at that store,
8  everything was a joke.
9      Q.  What do you mean?
10     A.  They would -- Mario would draw pictures
11 of people and place them on the wall and it was
12 a joke, it was funny.  Everything was a joke.
13 So anything that was -- should have been taken
14 seriously, was a complete and utter joke.  No
15 one took anything seriously, no matter what it
16 was.
17         They took a doll of -- God, I can't
18 think of his name right now.  My mind -- Vito
19 and attached it to a dartboard and were throwing
20 darts at it and they thought that was funny.  So
21 yeah, there's all kinds of fun stuff that they
22 were doing.  It was something that the sales
23 management did up at top.
24     Q.  Did Vito think that that was a funny

Page 152

1  joke, a picture of him?
2          MR. WHITE:  Objection, it calls for
3  speculation.
4          THE WITNESS:  I don't know what Vito
5  thought was funny or not.
6  BY MS. PALL:
7      Q.  You said Mario would draw pictures of
8  people and post them around.  What were the
9  pictures of?
10     A.  Vito had a purple sweater on, so he
11 drew a picture of him as Barney and put Barney's
12 head on it.  And he took a picture of my head
13 and put it wrestling, fighting with one of the
14 other salespeople.
15         And he would just do all kinds of fun
16 pictures and would post them on his -- so
17 Mario's office was -- Mario's desk was here,
18 Keith's was here.  Mario would post them right
19 next to him.  Right on his little wall, glass
20 wall right here.
21     Q.  Okay.  Anything else that you would
22 kind of describe as locker room banter or jokes
23 that would go on at the dealership?
24     A.  I mean, as I said, sales management,

Page 153

1  everything was a joke so.
2      Q.  And I'm trying to understand what you
3  mean by everything was a joke.  Other than
4  posting the pictures of, you know, of other
5  employees --
6      A.  How they treated salespeople, how they
7  treated situations, how they treated customers.
8  All that was a joke.
9      Q.  How so?
10     A.  Indian customers were left to walk
11 around the store quite a few times.  No one took
12 care of them, they would make fun of it.
13     Q.  You said Indian --
14     A.  Indian customers, yes.
15     Q.  Okay.
16     A.  A salesperson would come up not knowing
17 where he was going with a deal and stuff like
18 that and they would pick on him for not knowing
19 what he's doing or he doesn't know how to do his
20 job, things of that nature.  The same comments
21 were made to me, you don't know how to do your
22 job, you don't know how to use a computer, you
23 know.  These were comments that were just thrown
24 around like it was -- like they were candy in

Page 154

1  the store.
2      Q.   And did Mario do that to everyone at
3  the store?
4      A.   The entire management team did that to
5  everybody.
6      Q.   Okay.
7           MR. WHITE:  Objection to form and
8  foundation.
9  BY MS. PALL:
10     Q.   So is it the case, Mr. Sheaffer,
11 that -- well, actually, let me back up.
12          You said the entire management team.
13 So who else in addition to Mr. Zubek would
14 engage in that kind of behavior?
15     A.   Keith, Mario, Pete Binner, Jim Urso who
16 was a sales manager there before for a period of
17 time and then they brought in Vince and -- they
18 all -- the whole management team, it was all a
19 joke.
20     Q.   And would they joke around with all
21 employees?
22          MR. WHITE:  Objection to foundation and
23 form.
24          THE WITNESS:  I think there were

Page 155

1  particular ones they joked around with more.
2  BY MS. PALL:
3      Q.   Who was that?
4      A.   CJ, Emilio maybe.  I don't remember all
5  the names of the salespeople, so I apologize.
6  But there were -- there were ones that were
7  favorites, Orlando being a favorite.  Orlando
8  was a very good sales person, sold a lot of
9  cars.  No one really kind of messed with Orlando
10 because Orlando could sell cars and he did a
11 very good job and that was across the board, you
12 just -- no one messed with him.
13          But there was -- you could walk up a
14 tower and they're, you know, messing with a
15 salesperson over what he did or how he handled a
16 situation.  Mainly a green pea salesperson that
17 would start and didn't know what he -- what
18 the -- how to do his job, there was zero
19 training for these people, but yet they would
20 make fun of how they handled themselves.
21     Q.   Okay.  And you mentioned CJ and Emilio.
22 Are those salespeople?
23     A.   Yes, ma'am.
24     Q.   And are you saying that they -- they

Page 156

1  were people that were joked around with more?
2      A.   They were made fun of more.
3      Q.   Made fun of more.  By Mario?
4      A.   Yes.
5      Q.   Anyone else in addition to CJ and
6  Emilio who you recall were made fun of by Mario?
7      A.   Again, I don't remember all the
8  salespeople's names.  That's going back three
9  years.
10     Q.   Okay.
11     A.   So yes, there were a group.  I mean, if
12 I had a name list, I could possibly say this
13 person, this person.  But I don't remember the
14 names of everybody.  I mean, there's 20-some odd
15 salespeople there.  And in the interim, people
16 came and went so.
17     Q.   And is it your testimony that it was
18 kind of based on performance whether they were
19 joked around with more?
20     A.   Performance, sure; if they liked them,
21 sure; if they didn't like them, sure.  I mean,
22 it all depended on what they were doing at that
23 point.
24     Q.   Okay.  Did this joking around on behalf

Page 157

1  of Mario and the other managers occur during
2  your entire tenure at Glendale Nissan?
3      A.   Yes.
4      Q.   Did you ever say anything to any of the
5  managers who were joking around with employees
6  that -- about that?
7      A.   Yeah.  They've gone too far and don't
8  do that, I mean, it's not something you do.
9      Q.   When did you do that?
10     A.   I don't have any specific incidents.
11     Q.   Okay.  Who did you say that to?
12     A.   The management sitting at that desk.
13     Q.   Who was that?
14     A.   Mario, Keith, Pete, Jim Urso, the other
15 sales manager, I don't remember what it was.  I
16 don't -- Vince really wasn't involved a lot in
17 that part of it but it pretty much came from,
18 you know, the group sitting right there in the
19 front there.
20     Q.   And you told them that their jokes were
21 going to far?
22     A.   Yes.  And then when Arben became a
23 sales manager, it escalated even more.
24     Q.   When Arben Halipaj became a sales

Page 158

1  manager?
2      A.   Yes.
3      Q.   In what way did it escalate?
4      A.   Well, Arben was a -- was a salesperson
5  who was -- I don't know what word I want to use
6  to describe him, but was a salesperson that
7  intimidated a lot of salespeople.
8           In fact, when he was promoted to sales
9  manager, a lot of the people were surprised he
10  was promoted to sales manager because of his
11  situations and how he handled the situations and
12  how he handled the customers and things of that
13  nature.  It was kind of a shock to everybody.
14      Q.   You said Arben intimidated other
15  salespeople?
16      A.   Yes.
17      Q.   In what way?
18      A.   There was one salesperson that he
19  needed one more car to get his bonus for the
20  month of an RDR and Arben went and bought that
21  RDR from another salesperson and made it a joke
22  that he stole the RDR from the guy, that he
23  wouldn't make that point.
24      Q.   Can you explain that?  I'm not sure I

Page 159

1  understand.
2      A.   RDR is a retail delivery report --
3      Q.   Okay.
4      A.   -- that they've RDR'd the car in your
5  name.  So CJ was the salesperson, Arben was the
6  salesperson.  Arben -- CJ needed one more car
7  and that gave him a bonus from Nissan.  I don't
8  know all the intricacies because I'm not a
9  salesperson at this point.  So Arben went and
10  made sure he bought that RDR from a salesperson
11  so he could not get his bonus and made a joke of
12  it and thought it was funny.  Another
13  salesperson got in --
14          MR. WHITE:  Wait for the question.
15          THE WITNESS:  Sorry.
16  BY MS. PALL:
17      Q.   Go ahead.  You were going to provide an
18  example of another salesperson?
19      A.   Another salesperson with Arben where
20  the salesperson did something that Arben didn't
21  like and he took him out in the back to try to
22  have a fight with him.
23      Q.   Okay.  And is Arben one of the people
24  that you told their jokes were going to far?

Page 160

1      A.   Yes.
2      Q.   Okay.  In what way did you think they
3  were going to far?
4      A.   Just they were -- you don't abuse a
5  salesperson, you don't abuse people.  These are
6  grown adults who have families to feed.
7      Q.   Did you ever joke around with other
8  employees?
9      A.   Everyone jokes around with other
10  employees.  But I joked around with them in a
11  normal fashion that wasn't disgusting or out of
12  place.
13      Q.   How did you joke around with employees?
14      A.   I don't have a specific incident.
15      Q.   How is the way that others -- let's say
16  Mario, for example, how is the way that he was
17  joking around with people out of place?
18      A.   His jokes were direct and they were
19  very vicious.
20      Q.   Can you provide an example?
21      A.   Again, obviously just the pictures
22  of -- drawing pictures of people and putting
23  them on Snapchat, I think is what it's called,
24  Snapchat and things of those natures and just

Page 161

1  the way he talked to people is, you know -- it
2  just was not -- it was not appropriate.
3      Q.   How is it not appropriate?
4      A.   Talking down to them, talking to them
5  like they're stupid, making fun of them because
6  they may be stupid or didn't know what was going
7  on in a situation.
8      Q.   With respect to the book of penises
9  that you allege Mr. Zubek showed you, did he
10  post those around the dealership?
11      A.   No.  They were just in a notebook.
12      Q.   Going back to the instances you allege
13  that Mr. Zubek sexually harassed you.  Did that
14  alleged harassment interfere with your ability
15  to do your work at Glendale Nissan?
16      A.   It severely bothered me.
17      Q.   Did it interfere with your ability to
18  do your work?
19      A.   Well, it interfered with my personal
20  life and sleep and things of that nature, yes.
21      Q.   So it did not interfere with your
22  ability to do your job at Glendale Nissan?
23          MR. WHITE:  Objection.  Objection, it
24  misstates testimony.  You can answer.

Page 162

1    THE WITNESS:  Again, I don't think
2  it direct -- I'm capable of doing my job.  You
3  know, I've been doing it for a long time, so
4  I'm -- I'm capable of doing my job.
5  BY MS. PALL:
6    Q.    Sure.  How did it interfere with your
7  personal life?
8    A.    Lack of sleep, depression, frustration.
9    Q.    Did you see any medical providers about
10 those symptoms, lack of sleep, depression,
11 frustration?
12   A.    No.
13   Q.    Did you take any medication?
14   A.    No.
15   Q.    Did Mr. Binner's alleged sexual
16 harassment of you interfere with your ability to
17 do your job at Glendale Nissan?
18   A.    It just caused me stress that day
19 and -- and, you know, it was -- I don't know --
20 I can't tell you that in the long term.  But for
21 that day, it definitely stressed me out and
22 upset me that day, yes.
23   Q.    And by that day, you're referring to
24 the one day that he put the photo on your

Page 163

1  computer?
2    A.    Both times when he approached me with
3  the situations, it was -- it was way beyond any
4  spectrum of any normalcy.
5    Q.    And so those two situations are first
6  the photo --
7    A.    Yes, ma'am.
8    Q.    -- on your computer; and second, the
9  comment during the discussion about taking you
10 out back?
11   A.    Into the service department.
12   Q.    And so those are the two instances?
13   A.    Yes, ma'am.
14   Q.    So did -- and did those things
15 interfere with your ability to do your work on
16 those two days?
17   A.    Again, all it did was upset me and, you
18 know, I mean, it frustrated with me.  I mean, it
19 was not -- I was able to complete my tasks, yes.
20   Q.    Okay.  Are you alleging in this case
21 that you were sexually assaulted by Arben
22 Halipaj?
23   A.    I am saying he grabbed me in an
24 aggressive manner.  I don't believe it was

Page 164

1  sexual assault but he grabbed me in a sexual
2  manner where he actually put a rib out of -- out
3  of place.
4    Q.    So I'm sorry, you don't believe it was
5  a sexual manner?
6    A.    I don't believe it was a sexual manner,
7  I think it was more aggressive than anything
8  else.
9    Q.    Okay.  Where were you at the time of --
10 of this incident?
11   A.    Sales tower.
12   Q.    And when was this?
13   A.    I don't recall the dates.  Again, early
14 January, January, February area.
15   Q.    January, February, 2018?
16   A.    Yes, ma'am.
17   Q.    What were you doing immediately before
18 this incident?
19   A.    Probably working in my office, coming
20 up to the desk.
21   Q.    Were you talking to anyone?
22   A.    I was -- I came up to the tower to talk
23 to somebody about something, I don't recall what
24 it was.  It could have been about a deal, it

Page 165

1  could have been a question, whatever.
2    Q.    Do you recall who you were talking to
3  at the time?
4    A.    Probably it was Mario or -- or Pete
5  Binner.  Whoever was at the desk at that point.
6  I don't remember exactly who it was.
7    Q.    So you don't recall precisely who you
8  were speaking to at the time?
9    A.    No.
10   Q.    And what did Arben do?
11   A.    He -- so I was standing like this.
12 Arben came up to me on this side over here and
13 then rapped his arms around me as much as he
14 could and lifted me up like this.
15   Q.    So for the record, he came up to your
16 right side?
17   A.    Right side.
18   Q.    And kind of gave you a bear hug?
19   A.    Not frontal, not -- side.  From the
20 side.  So from my right side, he literally
21 picked me up from my right side and squeezed as
22 hard as he could and then leaned back into it.
23   Q.    Were both of his arms around both of
24 your arms?

Page 178

1    MR. WHITE: We can short circuit. You
2  said several, he said consistently.
3    MS. PALL: Okay. I don't know that
4  that's -- I'm -- so let me -- let me rephrase my
5  question.
6  BY MS. PALL:
7    Q.  With respect to the incidents that you
8  alleged wherein Mario Zubek told you that he
9  would give you a blow job, did you ever complain
10 to anyone at Glendale Nissan --
11   A.  Yes.
12   Q.  -- about that conduct?
13   A.  Yes.
14   Q.  Who?
15   A.  Keith.
16   Q.  Anyone else?
17   A.  No. Probably Dave but, I mean, he
18 works with me.
19   Q.  Dave Martin?
20   A.  Yes, ma'am.
21   Q.  Anyone else?
22   A.  Dan Gutierrez.
23   Q.  Anyone else?
24   A.  I don't know if Linda was there or the

Page 179

1  previous office manager was there. Whoever was
2  the office manager at that time, I'm not quite
3  sure which one it was.
4    Q.  Anyone else?
5    A.  That's it.
6    Q.  And Dave Martin and Dan Gutierrez were
7  people that worked for you --
8    A.  Yes, ma'am.
9    Q.  -- correct?
10   When did you complain to Keith about
11 Mr. Zubek --
12   A.  I think --
13   MR. WHITE: Wait for the question.
14 BY MS. PALL:
15   Q.  -- informing you or telling you that he
16 would give you a blow job?
17   A.  Again, probably the second or third
18 time it happened.
19   Q.  When was that, approximately?
20   A.  I don't know the exact dates.
21   Q.  Again, would this be January, 2018?
22   A.  January, 2018.
23   Q.  On how many occasions did you speak to
24 Keith about this issue?

Page 180

1    A.  Two or three times.
2    Q.  When was the last time?
3    A.  Probably late February, mid-February.
4    Q.  So let's take the first time that you
5  talked to Keith about this. Where were you?
6    A.  I think it was the sales tower, sales
7  tower.
8    Q.  At Glendale Nissan?
9    A.  Yeah.
10   Q.  Was anyone else present?
11   A.  I don't recall.
12   Q.  What did you say to Keith?
13   A.  I told him that, you know, he's telling
14 me he'll give me a blow job if I get a better
15 deal for him. And he says, it's a joke, come
16 on, lighten up. He's just joking around.
17   Q.  And what did you say to Keith?
18   A.  It's not a joke, but it's pretty much
19 in the conversation.
20   Q.  Was there anything else to that
21 conversation?
22   A.  Not much more.
23   Q.  What about the second time you talked
24 to Keith about it, where were you?

Page 181

1    A.  Again, it's the same situation. Hey,
2  this guy keeps making goofy comments, it's
3  ridiculous. Oh, he's just joking around,
4  everything is a joke, don't worry about it.
5    Q.  Where were you for that conversation?
6    A.  That may have been -- that probably was
7  in the tower or in my office, I'm not sure.
8    Q.  Was anyone else present?
9    A.  I don't recall.
10   Q.  What about the third time that you
11 talked to Keith about this, where were you?
12   A.  Similar situation.
13   Q.  Where were you?
14   A.  I don't recall whether it was my office
15 or whether it was in -- you know, but I mean, a
16 similar situation, it was a joke, everyone -- it
17 was a joke, don't worry about it, lighten up.
18   Q.  All these conversations were in person?
19   A.  Yes, ma'am.
20   Q.  And they were all either at the sales
21 tower or in your office?
22   A.  Yes, ma'am.
23   Q.  And you don't recall whether anyone
24 else was present for any of those conversations?

Page 186

1    Q.   Did she say anything else?
2    A.   That's pretty much it.
3    Q.   Did you say anything else?
4    A.   I don't remember any more of the
5    conversations.
6    Q.   Was anyone else present for those
7    conversations?
8    A.   The girl that sits right outside of her
9    office, I don't remember her name.  She may have
10   overheard the conversation, I don't know.
11   Q.   She was not in the office?
12   A.   She was not in the office, no.
13   Q.   Was the door open when you made --
14   A.   Yes, it was.
15   Q.   -- these comments?
16   A.   Yes.
17   Q.   What was the position of the girl that
18   sits outside --
19   A.   She was our biller.
20        MR. WHITE:  You've got to slow down.
21   Wait for the question to finish.
22        THE WITNESS:  I'm sorry.  She was our
23   biller.
24   BY MS. PALL:

Page 187

1    Q.   But you don't recall her name?
2    A.   No.
3    Q.   Were you dissatisfied with the response
4    that you got from Keith when you complained
5    about Mr. Zubek's conduct?
6    A.   It was made to be a joke.
7    Q.   I'm sorry?
8    A.   It was made to be a joke.
9    Q.   What do you mean it was made to be a
10   joke?
11   A.   The comment that I made was made to be
12   a joke.  It was laughed at, it was scoffed at.
13   Q.   You're saying Mr. Narozny scoffed at
14   your comment?
15   A.   It was just -- it was just more of it's
16   a joke, don't worry about it, man up.
17   Q.   Did you escalate that complaint to
18   anyone else?
19   A.   I thought talking to the office manager
20   would escalate it but it went nowhere.  So I
21   mean, it's, you know, the old preaching to the
22   choir conversation, you complain and nobody does
23   anything.
24   Q.   Did you ever escalate the complaint to

Page 188

1    the president of the company?
2    A.   I've never talked to Bill Slevin in the
3    two years I worked there.
4    Q.   Did you ever ask anyone for his phone
5    number?
6    A.   No.
7    Q.   Or an e-mail address?
8    A.   No.
9    Q.   Did you ever make a complaint about
10   Mr. Binner putting the picture on your computer?
11   A.   Yes.
12   Q.   Who did you complain to?
13   A.   I went to Mario.  And, again, that
14   became a joke.
15   Q.   Did you complain to anyone other than
16   Mario?
17   A.   I believe I told Keith about it.
18   Q.   Anyone else?
19   A.   That's it.
20   Q.   When did you tell Mario about the
21   incident?
22   A.   Right after it happened.  Specifically
23   he just put something on my desktop that was
24   inappropriate.

Page 189

1    Q.   So right after you noticed the image on
2    your desktop, you went to Mario?
3    A.   Uh-huh.
4    Q.   Is that a yes?
5    A.   Yes, ma'am.
6    Q.   And what did Mario say?
7    A.   He laughed at it, thought it was a
8    joke.
9    Q.   Where did this conversation occur?
10   A.   At the tower.
11   Q.   Was anyone else present?
12   A.   I don't recall who else was present.
13   Probably Arben.
14   Q.   Why do you think Arben was present?
15   A.   Because Arben was always where Mario
16   was.
17   Q.   Do you have a specific recollection of
18   Arben being part of this conversation or being
19   close to this conversation?
20   A.   I think he was sitting at the desk
21   there, but I don't remember much more than that.
22   Q.   Was Arben a part of the conversation
23   with Mario?
24   A.   He made a comment about how it was

Page 190

1  funny and to lighten up and, you know, it was a
2  joke.  Just a joke, everything's a joke.
3      Q.   And how did you respond?
4      A.   I told him it was disgusting and it's
5  unacceptable.  I believe I showed Mr. Gutierrez,
6  Dan Gutierrez the picture, too.  I said, this is
7  what he just put on my computer.
8      Q.   When did you show the image to
9  Mr. Gutierrez?
10     A.   Once I got in my office and saw my
11 computer screen like that.
12     Q.   I'm sorry.
13     A.   Once I walked into my office, I sat
14 down at my desk and there's my computer screen
15 with this image on it.
16     Q.   And my question is when did you show
17 Mr. Gutierrez the image?
18     A.   Right after I walked into my office.  I
19 called him into my office to show it to him.
20     Q.   Okay.  Who else did you show it to, if
21 anyone?
22     A.   I want to say I showed it to Mario but
23 I don't recall if I did or not.
24     Q.   Okay.  Was there anything other --

Page 191

1  anything else to the conversation that you had
2  with Mario about the image, other than what
3  you've just testified to?
4      A.   Not that I recall.
5      Q.   Okay.  And you said that you may have
6  told Keith about the image?
7      A.   I know -- I believe I told you about
8  the image but it was a joke again.
9      Q.   When did you tell Keith about the
10 image?
11     A.   That Saturday.
12         MR. WHITE:  Bob, Bob.
13         THE WITNESS:  Sorry.
14         MR. WHITE:  It's going to mess up the
15 microphones.
16         THE WITNESS:  Sorry.
17 BY MS. PALL:
18     Q.   The Saturday following the date on --
19     A.   Yes.
20     Q.   -- which the image was put on your
21 computer?
22     A.   Yeah.  That would have been the next
23 time I would have seen Keith would be Saturday.
24     Q.   Do you recall what day of the week it

Page 192

1  was when the image was put on your computer?
2      A.   I want to say Wednesday or Thursday.
3      Q.   Okay.  And where did this conversation
4  with Keith take place?
5      A.   Again, at the tower with the entire
6  bunch up there, the whole group.
7      Q.   Who was there?
8      A.   Mario, Keith, Arben, Pete.  I don't
9  know if the used car manager was there.  I don't
10 know if the used car manager was -- I don't
11 know --
12     Q.   Who was the used car manager?
13     A.   I don't know if it was Vince at that
14 point.  I don't know who it was at that point.
15 It may have been -- I don't know.  It may have
16 been Vito, I don't remember.
17     Q.   Anyone else that you recall being
18 there --
19     A.   No.
20     Q.   -- for that conversation?
21     A.   No.
22     Q.   And tell me what you said to Keith and
23 what he said to you?
24     A.   I told him I've got a picture of two

Page 193

1  guys having sex on my desktop, and it became a
2  joke again.
3      Q.   And what did Keith say?
4      A.   You've got to lighten up, man, it was a
5  joke.  Don't take these things so seriously.
6      Q.   Did you say anything else to Keith?
7      A.   When you start being made fun of making
8  a -- making a complaint, you don't stand there
9  very long.  You leave.
10     Q.   So did you say anything else to Keith?
11     A.   I believe I just left after that.
12     Q.   And, again, you've already testified
13 you didn't tell anyone other than Mario and
14 Keith about the image that Mr. Binner allegedly
15 put on your computer --
16     A.   Well, I definitely approached --
17     Q.   -- correct?
18     A.   I definitely approached Pete Binner on
19 the image.
20     Q.   Okay.  And if you could just -- I know
21 you're trying, but wait until I finish my
22 question --
23     A.   Okay.  Sorry.
24     Q.   -- before you start to answer.

Page 202

1    Q.   Okay.  Thank you.  And how soon after
2  Mr. Binner's alleged comments did you have these
3  conversations with Dave and Dan and Rebecca?
4    A.   That day or -- again, if Dan wasn't
5  there that day, it would have been the next day.
6    Q.   Okay.  So within 24 hours?
7    A.   Within 24 hours.
8    Q.   Okay.  Is there anyone else you told
9  about Mr. Binner's comment other than Dave
10 Martin, Dan Gutierrez and Rebecca, the BDC
11 manager?
12   A.   My girlfriend.
13   Q.   When did you tell your girlfriend?
14   A.   That day, that time it happened.
15   Q.   And where were you for that
16 conversation?
17   A.   In my office.
18   Q.   She had come into the dealership?
19   A.   I believe I called her.
20   Q.   And what did you say to her?
21   A.   Exactly what had happened, what he said
22 to me.
23   Q.   I'm sorry?
24   A.   What he said to me.

Page 203

1    Q.   And what did she say?
2    A.   That's disgusting.  I said, I agree, I
3  can't believe somebody would say that to
4  somebody.
5    Q.   Was anyone else present on the call
6  that you're aware of?
7    A.   No.
8    Q.   So other than telling Dave Martin, Dan
9  Gutierrez, Rebecca, the BDC manager, and
10 girlfriend about Pete's alleged comments, did
11 you tell anyone else about those comments?
12   A.   No.
13   Q.   Did you ever complain to anyone about
14 Mr. Zubek showing you the book -- the notebook
15 he had of penises?
16   A.   I believe I said to Keith that he had
17 shown that to me.
18   Q.   Is there anyone you told other than
19 Keith?
20   A.   My girlfriend, Dave Martin, Dan
21 Gutierrez.
22   Q.   Anyone else?
23   A.   My lawyers.
24   Q.   I don't want to know about your

Page 204

1  conversations with lawyers.
2         MR. WHITE:  Yeah, don't talk about
3  stuff you talked about with lawyers.
4         THE WITNESS:  Okay, all right.  Sorry.
5  BY MS. PALL:
6    Q.   Other than your lawyers, Keith, Dave
7  Martin, Dan Gutierrez and your girlfriend -- did
8  I -- did I get those names switched up?
9         Other than Keith, Dave Martin, Dan
10 Gutierrez and your girlfriend and your lawyers,
11 is there anyone else that you told about Mario's
12 notebook?
13   A.   No.
14   Q.   Okay.  Starting with the conversation
15 with Keith.  When did that happen?
16   A.   With what -- with regards to what?
17   Q.   With respect to telling Keith about the
18 notebook, when did that conversation take place?
19   A.   About the same time all this other took
20 place, around that same time.
21   Q.   Was this part of another conversation
22 you were already having with Keith?
23   A.   No.  The same conversation.
24   Q.   So it was part of the same conversation

Page 205

1  you had with Keith about what else?
2    A.   About the blow job conversations.
3    Q.   Okay.  How many conversations did you
4  have with Keith about the notebook?
5    A.   I believe one.
6    Q.   And it occurred somewhere in or around
7  January, 2018?
8    A.   January, '18 to February, yes.  I
9  believe that one happened like early -- late
10 January, early February.
11   Q.   Late January or early February --
12   A.   Yes, ma'am.
13   Q.   -- 2018?
14   A.   Yes, ma'am.
15   Q.   And where did that conversation take
16 place?
17   A.   At the tower.
18   Q.   Who else was present?
19   A.   I don't know.
20   Q.   Was anyone else present?
21   A.   No, I don't remember.
22   Q.   And to the best of your recollection,
23 what did you say to Keith and what did he say to
24 you?

# EXHIBIT D

| Employees Employed Between 1/1/2018 and 3/13/2018 | | |
|---|---|---|
| **Employee Name** | **Home Department Number** | **M/F** |
| CINTRON, LAUREN A | AP CLERK | F |
| CANALES, MARIZZA J | BDC REPERSETNATIVE | F |
| TORRES, BEATRIZ B | BDC REPERSETNATIVE | F |
| MICHALIK, JONATHAN M | BDC REPERSETNATIVE | M |
| GRANGER, BRIANNA J | BDC REPERSETNATIVE | F |
| BALONIER, REBECCA | BDC REPERSETNATIVE | F |
| BONILLA, KARINA | BDC REPERSETNATIVE | F |
| VALENTINO, RACHEL M | BILLING CLERK | F |
| SHREWSBURY, MEGAN R | CASHIER | F |
| CHRONOWSKI, MARY K | CASHIER | F |
| DUNTEMAN, HEATHER J | CASHIER | F |
| PATTERSON, FRANCES E | CLERICAL OFFICE | F |
| GIOIA, YOLANDA L | CLERICAL OFFICE | F |
| O'DONNELL, MARTIN J | CONTOLLER | M |
| SHEAFFER, ROBERT A | FINANCE MANAGER | M |
| GUTIERREZ, DANIEL | FINANCE MANAGER | M |
| MARTIN, DAVID N | FINANCE MANAGER | M |
| ZUBEK, MARIUSZ | FINANCE MANAGER | M |
| ADKINS, JANICE L | OFFICE MANAGER | F |
| YENDER, LINDA R | OFFICE MANAGER | F |
| DOUGAN, KRISTEN D | OFFICE MANAGER | F |
| STOLTZ, CHARLES | PARTS COUNTER | M |
| HOOD, DANIEL E | PARTS COUNTER | M |
| DELEON, ALDO | PARTS COUNTER | M |
| PEARCE, CASEY | PARTS COUNTER | M |
| RUIZ-SERNA, ALBERTO | PARTS COUNTER | M |
| ANTONIAN, ALBERT V | PARTS MANAGER | M |
| HALL, ROBERT | PARTS MANAGER | M |
| BEGAJ, LUIS | PORTER | M |
| DORADO, ROGELIO | PORTER | M |
| SALAZAR, CHRISTIAN P | PORTER | M |
| BARBOSA, JOSE A | PORTER | M |
| SANDERS, JUSTIN M | PORTER | M |
| GUTIERREZ JR, RICK V | PORTER | M |
| LOPEZ-NUNEZ, JOSHUA | PORTER | M |
| SOTO, LUIZ A | PORTER | M |
| SIERRA, KALEB M | PORTER | M |
| GUTIERREZ ORTA, ANTONIO DE JESUS | PORTER | M |
| CORRAL, EDDIE | PORTER | M |
| PEDROZA, WILLIAM S | PORTER | M |
| HURTADO, JUAN J | PORTER | M |
| MURILLO, ALEJANDRO | PORTER | M |
| VENCES, JESUS | PORTER | M |

| Employee Name | Home Department Number | M/F |
|---|---|---|
| NEVAREZ, LUIS | PORTER | M |
| GARCIA, ARMANDO | PORTER | M |
| RAMIREZ, JORGE | PORTER | M |
| SANCHEZ VENCES, J MERCED | PORTER | M |
| BERRUM-GRACIAS, MARTIN | PORTER | M |
| BRADFIELD, JACOB E | PORTER | M |
| SLEVIN, WILLIAM A | PRESIDENT | M |
| CHAVEZ, JORGE J | SALES MANAGER | M |
| MORENO, VINCENTE J | SALES MANAGER | M |
| BINNER, PETER | SALES MANAGER | M |
| IBRAHIM, UTHMAN A | SALES MANAGER | M |
| HERNANDEZ, JOSHUA M | SALESMAN | M |
| PANTAZOPOULOS, PETER N | SALESMAN | M |
| BALDERAS, WILLIAM D | SALESMAN | M |
| BRYNIARSKI, SIMON | SALESMAN | M |
| TRAN, KEVIN | SALESMAN | M |
| CABRERA, EMALIEL | SALESMAN | M |
| MANN, BARRY M | SALESMAN | M |
| TRINIDAD, HENRY | SALESMAN | M |
| BATALLAS, JAIME | SALESMAN | M |
| GUAJARDO, VICTOR M | SALESMAN | M |
| SILVA, ORLANDO | SALESMAN | M |
| SHARLOW, BEN | SALESMAN | M |
| JAVADI, BAHRAM | SALESMAN | M |
| DELGADO, ROLANDO | SALESMAN | M |
| HUTCHESON, JAMES W | SERVICE DIRECTOR | M |
| FELIPE, EDGAR E | SERVICE WRITER | M |
| BIRDSELL, BRUCE R | SERVICE WRITER | M |
| FIOCCOLA, GIOVANNI B | SERVICE WRITER | M |
| VARGAS, EDGARDO | SERVICE WRITER | M |
| ABRON, KYNYATA M | SERVICE WRITER | F |
| SHIREMAN, JEFFREY A | SERVICE WRITER | M |
| PERREAULT, KEVIN T | SERVICE WRITER | M |
| GARAY, EMMANUEL | SERVICE WRITER | M |
| HOLDA, ANNA | SERVICE WRITER | F |
| DIPPING, CHRISTOPHER M | SERVICE WRITER | M |
| FELDMAN, CHRISTOPHER M | TECH | M |
| GARCIA, DANIEL I | TECH | M |
| SAENZ, HEDILBERTO | TECH | M |
| MUNOZ, HERNAN | TECH | M |
| ESPOSITO, MATTHEW D | TECH | M |
| BARNES, AKIN J | TECH | M |
| RODENBOSTEL, NEAL | TECH | M |
| WOOLLARD, STEVE G | TECH | M |

| Employee Name | Home Department Number | M/F |
|---|---|---|
| HERNANDEZ, ADAM | TECH | M |
| GARRAMONE, ANDREW J | TECH | M |
| STROUD, JEREMY C | TECH | M |
| RODRIGUEZ, CARLOS | TECH | M |
| RODRIGUEZ, JUAN R | TECH | M |
| RODRIGUEZ, DANIEL | TECH | M |
| CARLIN, JEAN | TITLE CLERK | F |
| MCMULLIN, DOROTHY J | TITLE CLERK | F |
| NAROZNY, KEITH | OPERATIONS DIRECTOR | M |

| | |
|---|---|
| Total Employees | 96 |
| Male Employees | 77 |
| Female Employees | 19 |
| Percent male | 80.2% |

| | |
|---|---|
| Total Sales and Finance Employees | 22 |
| Male Sales and Finance Employees | 22 |
| | 100% |